**Alexa WHEDON, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–0808–PC–677.**

Court of Appeals of Indiana.

Feb. 6, 2009.

Transfer Granted May 8, 2009.

---

John Pinnow, Greenwood, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Following her conviction for murder, Alexa Whedon appeals the post-conviction court's denial of her petition for post-conviction relief. Specifically, Whedon contends that the post-conviction court erred in determining that she failed to meet her burden of proving her newly discovered evidence claim and in excluding expert testimony during the post-conviction hearing about incentivized witnesses and wrongful convictions. Concluding that the post-conviction court's finding that a witness's testimony was not worthy of credit is not clearly erroneous and that the expert's testimony was not helpful to the trier of fact and was an improper comment on the credibility of the witnesses, we affirm the post-conviction court.

### Facts and Procedural History

The underlying facts taken from the Indiana Supreme Court's opinion on direct appeal are as follows:

[In 1998, sixteen-year-old Shanna Sheese's body] was discovered in a vacant lot, her death resulting from head wounds inflicted with a heavy, blunt object. Around the time of the murder, one witness saw the defendant, along with Vanessa Thompson, Malcolm Wilson, and another individual get out of a pick-up truck at a crack house. In the back of the truck was something covered by a tarp. The witness saw a pair of white low top tennis shoes sticking out from the edge of the tarp. The shoes seemed to be on feet because they were pointed up. Thompson quickly covered the feet with the tarp. The victim had been seen wearing the same type of shoes. Several witnesses testified regarding admissions made by the defendant of her involvement in the murder. She variously stated that she hit the victim in the head with a brick, that she held the victim down while Thompson hit her in the head, that she watched Thompson hold down the victim as a man named "Darrell" beat the victim in the head with a brick, that she was just a look-out, and that she helped hide the body. While the details and extent of the admissions vary, her statements were consistent that she was involved in the killing.

*Whedon v. State,* 765 N.E.2d 1276, 1278 (Ind.2002). Lisa Baker, Gail Davis, and Angela Garrett, who were housed in the Marion County Jail at the same time as Whedon, testified against Whedon at trial. None of these three witnesses were connected with Sheese's murder. Specifically, Baker testified that Whedon told her while they were both in the Marion County Jail that Whedon, Thompson, and Wilson picked up Sheese and drove her to another location. Then, Whedon, Thompson, and Darrell drove Sheese to a field where Thompson and Darrell beat Sheese in the head with a brick while Whedon watched. Garrett, who was incarcerated at the time of Whedon's trial, testified that she overheard Whedon saying in the recreation room at the Marion County Jail that she "had not killed the little girl, that Vanessa did, that she just held her down." Tr. p. 430. Then, Whedon said that she, Thompson, and Wilson transported the body in Wilson's truck to another location. Finally, Davis, who was also incarcerated at the time of Whedon's trial, testified that she was in the Marion County lockup when Whedon was first brought in on the murder charge. Whedon told Davis that Thompson had killed the girl but she was present during the killing. Whedon said that Thompson crushed the girl's head and they took her body behind a dumpster somewhere.

Following a bench trial, Whedon was convicted of murder under an accomplice liability theory, and our Supreme Court affirmed her conviction and sentence on direct appeal.[1]

In 2004, Whedon filed a petition for post-conviction relief, which she amended in 2007. In her petition, Whedon alleged, among other things, that newly discovered evidence mandated a new trial. The post-conviction court held a hearing on the petition in 2007.

At the hearing, Whedon's witness, Michelle Griffin, who was then incarcerated at Madison Correctional Facility on a forgery conviction, testified that she was in the Marion County Jail in 1998–99 on a forgery charge. She was in the jail at the same time as Whedon, Thompson, Davis, Baker, and Garrett.

---

1. Wilson and Thompson were also convicted of Sheese's murder, and their convictions were affirmed on direct appeal. *See Wilson v. State,* 765 N.E.2d 1265 (Ind.2002); *Thompson v. State,* 765 N.E.2d 1273 (Ind.2002).

Regarding Baker, Griffin testified as follows:

Lisa Baker was a phenomenal liar. She had that case, and she did say that when they were in, I believe, F block, all of them were together, and that they had all coerced all this together at the same time. I'm trying to think of the other girl that's—Secret, but I don't know Secret's first name. She is now I know—I know for a fact from being incarcerated, she's deceased, but they were all there together, so their stories were coerced as a group to—they had charges, I mean Lisa [Baker] had the carjacking charge and she was just out to figure out any way she could to basically get her charges dropped.

P–C Tr. p. 33–34. When asked if she heard them as a group rehearsing their trial testimony against Whedon, Griffin testified:

I was—as a matter of fact I was—my time that I spent with Lisa [Baker] mostly, because we were in the same cells next to one another in lock, all her whole thing was that she had read it from the newspaper, she had elaborated the story because she needed help to get out of prison, that she wasn't going to go do time. Well, I guess she ended up doing some time anyway and so forth and so on....

Id. at 34.

As for Garrett, Griffin testified that when they were later incarcerated at the Indiana Women's Prison, Garrett "didn't make any bones about how she coerced things to come out her way, to make[ ] things happen for her" and Carla Hall. Id. at 35. According to Griffin, Garrett "got all of her information, because they [Garrett and Hall] all got together and made it up, except the information that they got from the newspapers and the information that they had already had prior to going and talking to the detectives." Id. at 36. Griffin, however, made no specific allegations as to Davis.

The following cross-examination of Griffin ensued:

Q So Gayle Davis, Lisa Baker, and Angela Garrett told you that they cooked up testimony by reading the newspaper and then getting together and getting their facts straight?

A Yes, they did.

Q Did you see any of them read the newspaper about this case?

A No. The only reason is because before they ever got called—

Q You answered my question. That's fine. Thank you.

A I'm sorry.

Q Did you sit in on their conspiracy while they were making all of this up?

A No.

Q So they could have been lying to you; is that correct?

A Well, they could have been lying to me, but all the media was out before they ever went downstairs so that would kind of tell me that was a little—

Q Well, these are convicts, are they not?

A Well, sure, yes.

Q Any of these people ever lie to you about anything else?

A Well, actually I really didn't associate with them like that.

Q Okay. Good answer.

A You know, I'm saying where—right.

Q But they were all in there for crimes, correct?

A Exactly.

Q And you met all of these people again after they got convicted and

were in the DOC; you met all of these people again, right, saw all of them at one time or another?

A Right.

Q So they all got convicted of crimes, right?

A Well, yeah, they were convicted of crimes, yeah.

*Id.* at 40–42.

The post-conviction court entered findings of fact and conclusions of law denying Whedon relief. The pertinent conclusion provides:

> Defendant's remaining allegation of newly discovered evidence asserts that State's witnesses Lisa Baker, Gail Davis and/or Angela Garrett fabricated their trial testimony that Defendant made incriminating statements, and that said witnesses' motive was hopes that they would receive reduced sentences or other benefits from the State. Defendant's sole evidence on this issue was the testimony of DOC inmate Michelle Griffin. *See* findings of fact, paragraph 16 *supra.* Ms. Griffin called State's witness Lisa Baker a "phenomenal liar" (R. at 34) and testified that Lisa Baker told Griffin, several months after the sentencing, that Baker, Angela Garrett, and Carla Hall had "all got together and made it up, except the information they got from the newspapers." (R. at 37.) The testimony of Michelle Griffin would constitute mere impeachment evidence of the State's witnesses Garrett and Hall and, as such, it does not meet the newly discovered evidence test. Further, Griffin's testimony did not directly pertain to Gail Davis and fails to meet its burden as to the claim regarding Davis's testimony. . . .
>
> Also, the credibility of Defendant's witness Ms. Griffin is at issue in this assessment. Given the vagueness of several of Griffin's answers, her ac-

knowledgement that the State's witnesses could have been lying to her and the fact she did not know Baker or any of the State's witnesses very well, coupled with the fact that Griffin is currently serving an executed sentence for Forgery, a crime of dishonesty pursuant to Ind. Rule of Evidence 609(a), this Court finds her testimony lacking in credibility a[n]d, necessarily, the Court finds Defendant has failed to prove that Griffin's testimony is worthy of credit.

> Finally, even if the jury had heard Griffin's hearsay, impeachment evidence (as to Baker, Garrett, and Hall), the testimony of other State's witnesses— Dina O'Neal, Summer Sheese, Gail Davis, Susan Miller, Davida Altmeyer, DeShelley Sutton, Rayetta Thomas, Anita Jackson, Roy West, and John Pless— would remain unaffected. As such, Defendant has also failed to show that the evidence would probably produce a different result. Defendant has failed to meet her burden as to the newly discovered evidence claim and no relief may be granted thereon.

Appellant's App. p. 47–48. Whedon now appeals.

## Discussion and Decision

Whedon contends that the post-conviction court erred in denying her petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Henley v. State,* 881 N.E.2d 639, 643 (Ind.2008). When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* To prevail on appeal from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that

reached by the post-conviction court. *Id.* at 643–44. Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "'[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000), reh'g denied). The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind.2004).

Whedon raises two issues. First, she contends that the post-conviction court erred in determining that she failed to meet her burden of proving her newly discovered evidence claim. Second, she contends that the post-conviction court erred in excluding an expert witness's testimony during the post-conviction hearing about incentivized witnesses and wrongful convictions.

### I. Newly Discovered Evidence

■■ Whedon contends that the post-conviction court erred in determining that Griffin's post-conviction testimony did not constitute newly discovered evidence mandating a new trial. New evidence mandates a new trial only when a defendant demonstrates that: (1) the evidence has been discovered since trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) it is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at trial. *Taylor v. State*, 840 N.E.2d 324, 329–30 (Ind.2006). We "analyze[ ]

these nine factors with care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Id.* at 330 (quotation omitted). The burden of showing that *all* nine requirements are met rests with the petitioner for post-conviction relief. *Id.*

■■■ Here, the post-conviction court determined that Whedon failed to prove three of the nine requirements, that is, it found that Griffin's testimony was merely impeaching, was not worthy of credit, and would probably not produce a different result at trial. Appellant's App. p. 47–48. We, however, need only address one of these requirements on appeal—whether Griffin's testimony was worthy of credit. Whether a witness's testimony at a post-conviction hearing is worthy of credit is a factual determination to be made by the trial judge who has the opportunity to see and hear the witness testify. *McVey v. State*, 863 N.E.2d 434, 446 (Ind.Ct.App. 2007), *reh'g denied, trans. denied.* It is not within an appellate court's province to replace a trial judge's assessment of credibility with its own. *State v. McCraney*, 719 N.E.2d 1187, 1191 (Ind.1999).

The post-conviction court found that Griffin was very vague in her post-conviction testimony. Griffin generally called Baker a liar and said that Garrett made no bones about making "things" happen for her, but she did not elaborate. Griffin made no allegations whatsoever about Davis. In addition, the post-conviction court found that Griffin admitted that she did not know any details surrounding the alleged fabrication (because she was not present), the women could have been lying to her, she did not know them very well, and, at the time of the post-conviction hearing, Griffin was serving an executed sentence for forgery, a crime of dishonesty

pursuant to Indiana Rule of Evidence 609(a).

In order to determine whether Griffin's testimony is merely impeaching of Davis's, Baker's, and Garrett's trial testimony implicating Whedon in Sheese's murder, it must first be decided whether Griffin's post-conviction testimony is even credible. The post-conviction court found Griffin's testimony lacking in credibility and that Whedon had therefore failed to prove that it was worthy of credit. Given the deferential standard of review, it cannot be said that this finding is clearly erroneous. Accordingly, Whedon has failed to demonstrate that she is entitled to a new trial.

## II. Expert Testimony

 In a related argument, Whedon contends that the post-conviction court erred in excluding Rob Warden's testimony about incentivized witnesses and wrongful convictions. Warden is the Executive Director of the Center on Wrongful Convictions at Northwestern University School of Law. Warden had conducted studies on wrongful convictions involving incentivized witnesses, *i.e.*, "snitches."[2] The State moved to exclude Warden's testimony on the ground that it violated Indiana Evidence Rules 702 and 704. The post-conviction court excluded Warden's testimony, and Whedon made an offer of proof. On appeal, Whedon claims that Warden's testimony is relevant to her allegation of newly discovered evidence that the inmate witnesses concocted testimony that Whedon made incriminating statements about Sheese's murder in hopes of receiving favorable treatment from the State on their own sentences. The decision to admit or exclude expert testimony is entrusted to the sound discretion of the trial court, and we will reverse only for abuse of that discretion. *Ritchie v. State*, 875 N.E.2d 706, 728 (Ind.2007), *reh'g denied*.

> Indiana Evidence Rule 702(a) provides:
> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whedon had a bench trial on her murder charge, and the trial judge was well aware that several of the State's witnesses were then serving sentences for a variety of crimes and whether the witnesses were receiving a break from the State for testifying against Whedon. The subject of "incentivized testimony" is not a "scientific, technical, or other specialized" area in which an expert must guide the trier of fact. Rather, it falls squarely within the fact-finder's common sense that a witness's credibility may be affected based on the fact that the witness is serving a sentence and whether that witness is receiving favorable treatment from the State for testifying.

---

**2.** Warden defined incentivized witness testimony as follows:

> Well, obviously, many people who are in prison or jail or facing criminal charges would have an incentive to testify, to be treated leniently in the cases that are pending against them, or if they're already convicted, perhaps to have a recommendation for early release or vacating a sentence. In some cases the prosecutors have made explicit promises. In other cases, more typi-

> cally there is no explicit promise, but in every case a promise is either implied or inferred. And we've seen countless cases in which a witness testified that no incentive was offered, and a week after the guilty verdict in the case in which the person testified, that person is released from prison, has a sentence vacated or a sentence cut to time served.
> P–C Tr. p. 52–53.

To be admissible under Indiana Evidence Rule 702(a), an expert witness's opinion testimony must be helpful to the trier of fact. 13 Robert Lowell Miller, Jr., Indiana Practice § 702.103 at 444 (3d ed.2007). Because Warden's testimony fell within the trier of fact's common sense, it did not assist the trier of fact and was properly excluded.

 In addition, the gist of Warden's offer of proof was that inmate witnesses should not be believed because they have received an incentive to testify, which then leads to wrongful convictions. Although Whedon appears to argue that Warden did not testify about the inmate witnesses' credibility in this case, this was the ultimate point of his testimony: since incentivized witnesses are less likely to tell the truth, the inmate witnesses in this case were less likely to tell the truth.[3] Otherwise, Warden's offer of proof had no relevance to Whedon's claim for newly discovered evidence. Indiana Evidence Rule 704(b) prohibits a witness from testifying about whether a witness has testified truthfully. *See* Ind. Evidence Rule 704(b) ("Witnesses may not testify to opinions concerning ... whether a witness has testified truthfully."); *Rose v. State*, 846 N.E.2d 363, 367 (Ind.Ct.App.2006) (noting that a witness may not offer an opinion concerning whether a witness has testified truthfully because it would invade the province of the factfinder in determining what weight it should place upon a witness's testimony). Simply put, "[c]redibility is not a proper subject for expert testimony." *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir.1991). As such, the post-conviction court properly excluded Warden's testimony.

Affirmed.

RILEY, J., and DARDEN, J., concur.

---

**3.** Warden admitted that he did not read the transcript from Whedon's trial. He did, however, read the Indiana Supreme Court's opinions from Whedon's, Wilson's, and Thompson's direct appeals. According to his review of these opinions, Warden testified that the witnesses gave "wildly differing accounts" of what Whedon purportedly said. P–C Tr. p. 56. In addition, Warden said he found "no clearly verifiable fact" reported by the witnesses and nothing that had not been reported in the media, which was "highly problematic, obviously." *Id.* at 56–57. As for Whedon's trial, Warden said that the in-custody informants and possibly the witness who testified to seeing the shoes in the back of the truck were incentivized witnesses. Despite Whedon's claim, Warden *did* testify about the credibility of the witnesses in this case.